FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2016 OCT 31  A 10: 44

CLERK'S OFFICE

BY_____ DEPUTY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### Southern Division

AHMED R. RUCKER, #221-070

     **Plaintiff,**

**v.**

**LT. GEORGE HARRISON II,
IN HIS INDIVIDUAL AND OFFICIAL
CAPACITY**

     **Defendant.**

**Case No.: GJH-16-371**

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Ahmed R. Rucker, a prisoner confined at Western Correctional Institution ("WCI"), has filed a fee-paid civil rights action pursuant to 42 U.S.C. § 1983 against Lt. George Harrison, II, alleging retaliatory action against him while Rucker was housed at Maryland Correctional Institution-Jessup ("MCIJ"). In his Complaint, Rucker requests an award of compensatory and punitive damages, along with injunctive relief mandating Harrison's termination from employment. ECF No. 1 at 3.[1] In a Motion to Amend that shall be granted, ECF No. 5, Rucker further requests compensation for lost wages following termination from his prison job, declaratory relief that his rights were violated by Harrison's actions, and injunctive relief providing expunction of prison records with regard to the incident at issue here.

Pending is a Motion to Dismiss or, in the Alternative, for Summary Judgment filed on behalf of Harrison, ECF No. 14, and Rucker's Response, ECF No. 17. No hearing is needed at

---

[1] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

this time to resolve the issues raised. *See* Loc. R. 105.6 (D. Md. 2016). For the following

reasons, Defendant's Motion will be granted.

## I.     BACKGROUND

### A.     Rucker's Allegations

Until late February of 2015, Rucker, a medium security prisoner incarcerated within

Maryland's Division of Correction ("DOC"), participated in the Goucher College program[2] and

held a responsible shop position while housed at MCIJ. ECF Nos. 1 at 4; 5 at 1; 17 at 4, 6; 17-1 ¶

1. Rucker alleges that "as a direct result of several complaints" Rucker made against Harrison,

Harrison "launched a personal attack against [him]" and fabricated a blatant lie "in order to

advance his own agenda."[3] ECF No. 1 at 4. Rucker maintains Harrison's vindictive actions

violated his First Amendment right to seek redress for grievances and his Fourteenth

Amendment right to due process. ECF No. 17 at 8. Rucker admits that he was subjected to

disciplinary proceedings after a search of his cell yielded a USB cord, and he admits the cord

was his. ECF No. 17 at 3; *see also* ECF No.17-6 ¶ 4. He contends the "USB cord was not

specifically, or exclusively, for use as a cellphone charger." ECF No. 17-6 ¶ 6. Rucker does not

appear to claim the disciplinary proceedings were improper or violated his procedural due

process rights required pursuant to *Wolff v. McDonnell,* 41 U.S. 539, 557 (1974).

---

[2] Goucher, a local college, sponsors a prison education program to provide incarcerated Marylanders an opportunity to pursue a college education. The program is offered at MCIJ and the Maryland Correctional Institution for Women (MCIW). *See* http://www.goucher.edu/academics/other-academic-offerings/goucher-prison-education-partnership.

[3] The parties do not supply copies of the complaints. Rucker suggests that on April 20, 2015, he filed a complaint "detailing the illegal offer [Harrison] made to me." ECF No. 1 at 4. Rucker's Administrative Remedy Procedure ("ARP") grievance of April 21, 2015, suggests the rift between the two came about after Harrison believed he had been "fooled" by Rucker regarding the outcome of urinalysis testing. ECF No. 14-3 at 20-21. Rucker also suggests that on April 2, 2015, Harrison acted improperly by offering to recommend his release from segregation if Rucker agreed to end his participation in the Goucher program and prison job. ECF No. 14-3 at 24.

Rucker claims that after he completed his disciplinary segregation, Harrison "fabricated the paperwork necessary to place [Rucker] on administrative segregation completely disregarding the policy and procedures outlined in Case Management Section 18," and falsely stated that he personally attempted to serve Rucker with the necessary paperwork to effect this assignment, which Rucker refused to sign, on Sunday, April 26, 2015, a day on which Harrison did not work. ECF No. 1 at 4. Specifically, Rucker claims that while serving his disciplinary segregation sentence, he filed a complaint against Harrison on April 20, 2015[4]; in retaliation, Harrison placed information in his prison file stating Rucker "introduced contraband into the institution through the Goucher College program." *Id.* Although Rucker admits that the USB is his, Rucker appears to dispute 1) that the USB was contraband and 2) that he obtained it through his connection with the Goucher College program. As a result of the information that Harrison placed in his file, Rucker did not return to general population after completing his disciplinary segregation sentence, but instead was housed in the segregation unit on administrative segregation[5] until his transfer could be arranged.[6] Rucker states that Harrison's "vindictive motives" culminated in his September 9, 2015 transfer to WCI, a maximum security prison. ECF No. 1 at 4-5. As a result of the transfer, Rucker cannot obtain a good prison job and complete his education. *Id.* at 5.

---

[4] As already discussed in footnote 3, the parties do not supply copies of the complaint. Based on other material submitted by the parties, the Court believes that the complaint likely included a reference to the "illegal offer" Rucker alleges that Harrison made to him, i.e. offering to recommend his release from segregation if Rucker agreed to end his participation in Goucher. *See* ECF No. 1 at 4; ECF No. 14-3 at 24.

[5] Rucker states that he was retained on administrative segregation pending transfer solely because Harrison told the case management team that Rucker "introduced contraband" into the facility. ECF No. 17 at 3.

[6] Rucker suggests that one theory for the delay in transfer could be that case management was complicit in Defendant's desire to have him sent to WCI but had to wait until Rucker's known enemy, Joseph Dorsey, could be removed from WCI first. ECF No. 17 at 3.

### B.    Harrison's Response

Harrison is a Department of Public Safety and Correctional Services ("DPSCS")
employee working as a Lieutenant in the Intelligence Division, where he monitors gang activity,
collects and disseminates intelligence information, and investigates crimes alleged to have been
committed at MCIJ. ECF No. 14-2, ¶¶ 2, 4. Relying on confidential sources, Harrison initiated an
investigation into whether Rucker, who had some degree of freedom based on his participation in
the college program, might be passing cell phones to other prisoners. *Id.* ¶ 5.

On February 26, 2015, Lt. Charnel Hines and Lt. T. Traynham searched Rucker's cell and
found a small compartment with a white cloth containing a cell phone charger which Rucker
admitted was his. *Id.* ¶ 6; ECF No. 14-3 at 4. Later, another officer found a hole in the baseboard
where a cell phone could be hidden. ECF No. 14-2 ¶ 6. That same day, Hines completed a Notice
of Inmate Rule Violation of Rule 122 (possession of a telecommunication device, including
battery charger). ECF No. 14-3 at 4-5. Harrison approved the Notice of Inmate Rule Violation, *id.*
at 4, and on March 3, 2015, Shift Commander Shanea Ross further reviewed and approved the
Notice. *Id.* at 5.

Rucker was placed on administrative segregation pending the adjustment process. ECF
No. 14-2 ¶ 7. He was found guilty of two rules violations,[7] and sanctioned with 60 days in
disciplinary segregation and loss of visitation rights. *Id.*; ECF No. 14-3 at 7-8. Disciplinary
segregation was originally scheduled to end on April 26, 2015, ECF No. 14-2 ¶ 7, but was
extended by staff during March 25 and April 22, 2015 disciplinary segregation reviews. *Id.* at ¶
8; ECF No. 14-3 at 9. In both instances, the review team decided to maintain Plaintiff in
segregation for an additional 30 days, and the decisions were approved by the warden or his

---

[7] In addition to the Rule 122 violation, Rucker was charged with a violation of Rule 406, possessing or passing
contraband. ECF No. 14-3 at 4, 6.

designee. *Id.* The April 22, 2015 review extended segregation an additional 30 days beyond the April 26, 2015 end date for the disciplinary segregation sanction. *Id.* The case management team determined that Rucker should be retained on administrative segregation pending transfer to another institution. *Id.*; ECF No. 14-3 at 10-11.

Harrison avers that on or about April 26, 2015, he attempted to serve Rucker with a "Notice of Assignment to Administrative Segregation," which Rucker refused to accept. ECF No. 14-2 ¶ 9; ECF No. 14-3 at 18. Harrison claims he left a copy with Rucker, but is uncertain whether he served Rucker on Sunday, April 26, 2015 – a day he did not work – or the following day, Monday, April 27, 2015. ECF No. 14-2 ¶ 9.

The case management team reviewed Rucker's administrative segregation status on May 1, May 28, June 23, and August 19, 2015. ECF No. 14-2 at ¶ 10; ECF No. 14-3 at 10-17. Rucker remained on administrative segregation pending his September 9, 2015 transfer to WCI. ECF No. 14-2 ¶ 10; ECF No. 14-3 at 43. Harrison avers that none of these actions were undertaken in response to Rucker's complaints against him, but instead were based on intelligence information and security concerns. ECF No. 14-2 ¶ 12.

Rucker filed three Administrative Remedy Procedures (ARPs) relating to this matter. ECF No. 14-3 at 44. On April 21, 2015, just prior to coming off of disciplinary segregation, Rucker filed ARP MCIJ 0224-15 admitting to having a USB cord and presenting arguments that the cord was not a cell phone charger[8] and that Harrison at first took no action, but later indicated "his boss ordered him to place me...on segregation" and seek his transfer. ECF No. 14-3 at 19-20. Rucker alleged that Harrison "abuses his authority to arbitrarily transfer individuals who pose no security threat..." *Id.* He further stated Harrison later offered to recommend that Rucker be released from

---

[8] Rucker argued it was used to power other appliances, such as a television and an x-box games console. ECF No. 14-3 at 19-20.

disciplinary segregation, provided that he not return to the Goucher College program or work in the shop. *Id*. Rucker claimed that Harrison was upset with him because he had been fooled regarding a urine test, stated that being disciplined and transferred for being caught with a USB cord was disproportionate, and requested that Harrison be investigated and replaced because he was irrational, emotional and unprofessional. *Id* at 21. The ARP was dismissed as untimely. *Id*. at 19. Rucker filed an appeal to Headquarters on May 1, 2015, which was dismissed because ARP MCIJ 0224-15 had been filed untimely. *Id*. at 22.

On May 7, 2015, Rucker filed ARP MCIJ 0379-15, alleging that after his disciplinary segregation sentence was completed on April 26, 2015 he was placed on administrative segregation without explanation. *Id*. at 26-27. He alleged that on May 4, 2015, he received the case management team's recommendation of his assignment to administrative segregation pending transfer, but did not receive any paperwork explaining why he was being held on administrative segregation. *Id*. at 27. Rucker alleged that Harrison had his paperwork assigning him to administrative segregation, but refused to give it to him. *Id*. He reiterated his belief that Harrison should be dismissed from the intelligence unit and be thoroughly investigated. *Id*. Initially, Sgt. S. Schmitt dismissed ARP MCIJ 0379-15 as a case management matter, but on appeal, the Headquarters' ARP Coordinator returned it for further review. *Id*. at 28. Schmitt conducted an investigation, interviewed Rucker on June 15, 2015, and concluded that Rucker received but had refused to sign the Notice of Assignment to Administrative Segregation. *Id*. at 30-31. Schmitt concluded that another copy of the Notice of Assignment to Administrative Segregation should be provided to Rucker. *Id*. at 31. The warden confirmed this conclusion on June 25, 2015. *Id*. at 38. Rucker filed another appeal to Headquarters, arguing that Harrison had falsified the Notice of Assignment to Administrative Segregation based on the fact that Harrison

6

did not work on Sundays. *Id.* at 36. On August 6, 2015, the Commissioner found the appeal partially meritorious because Harrison had not gotten a second signature on the Notice of Assignment to Administrative Segregation after Rucker refused to accept service. *Id.* at 37. However, regarding the substance of the allegations, the Commissioner concluded that (1) Rucker refused to sign the Notice; (2) Rucker failed to provide additional evidence to substantiate his claim that he did not receive the paperwork upon his placement in Administrative Segregation; and (3) Rucker failed to substantiate his claim that Harrison acted in a less than professional manner. *Id* at 37.

On August 6, 2015, Rucker filed ARP MCIJ 0867-15 alleging that, as a result of ARP MCIJ 0379-15, he finally received a copy of the Notice of Assignment to Administrative Segregation, which supported his allegation that Rucker could not have served him on Sunday, April 26, 2015. *Id.* at 41-42. Rucker argued this discrepancy proved that Harrison had submitted a false report with the intention to mislead. *Id.* at 42. This ARP was dismissed on procedural grounds, with a stamp noting that inmates may not seek relief through the ARP regarding case management recommendations and decisions. *Id.* at 41.

## II.    STANDARD OF REVIEW

Harrison's motion is styled as a motion to dismiss under Fed. R. Civ. P. 12(b)(6) or, in the alternative, for summary judgment under Fed. R. Civ. P. 56. If the Court considers matter outside the pleadings, as the Court does here, the Court must treat a motion to dismiss as one for summary judgment. Fed. R. Civ. P. 12(d). When the Court treats a motion to dismiss as a motion for summary judgment, "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." *Id.* It is obvious that when the moving party styles its motion as a "Motion to Dismiss or, in the Alternative, for Summary Judgment," as is the case

here, and the nonmoving party attaches exhibits to its opposition, the nonmoving party is aware that materials outside the pleadings are before the court, and the Court can treat the motion as one for summary judgment. *See Laughlin v. Metropolitan Wash. Airports Auth.,* 149 F.3d 253, 260–61 (4th Cir.1998). Further, the Court is not prohibited from granting a motion for summary judgment before the commencement of discovery. *See* Fed. R. Civ. P. 56(a) (stating that the court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact" without distinguishing pre-or post-discovery).

However, summary judgment should not be granted if the nonmoving party has not had the opportunity to discover information that is essential to his opposition to the motion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 n. 5, (1987). If the nonmoving party feels that the motion is premature, that party can invoke Fed. R. Civ. Pro. 56(d). *See Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986). Under Rule 56(d), the Court may deny a motion for summary judgment if the non-movant shows through an affidavit that, for specified reasons, he or she cannot properly present facts, currently unavailable to him or her, that are essential to justify an opposition. Fed. R. Civ. Pro. 56(d). "'[T]he failure to file an affidavit . . . is itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate.'" *Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 244 (4th Cir. 2002)(citations omitted). However, a failure to file an affidavit may be excused "if the nonmoving party has adequately informed the district court that the motion is premature and that more discovery is necessary" and the "nonmoving party's objections before the district court served as the functional equivalent of an affidavit." *Id.* at 244-45 (citations and internal quotation marks omitted).

Here, Rucker, who has received copies of the exhibits that accompany the dispositive motion, ECF No. 15, and has attached exhibits to its opposition, is aware that materials outside

the pleadings are before the Court, and that the Court may treat the motion as one for summary judgment. Furthermore, Rucker has not filed an affidavit, pursuant to Fed. R. Civ. Pro. 56(d), to show what essential facts, currently unavailable to him, he could present if given an opportunity to conduct discovery. Rucker has requested answers to interrogatories or a declaration from Warden Parrish, along with any video footage that would show that he was not served with the contested notice of assignment to administrative segregation on April 26-27, 2015. ECF No. 17 at 11. The Warden is not a party to this action, and Rucker does not indicate what information might be gleaned from the Warden's response.[9] Further, for reasons addressed herein, the date of notice of assignment to administrative segregation is not sufficiently material to the outcome of this case. Thus, the Court is satisfied that it is appropriate to address Harrison's motion as one for summary judgment.

Summary judgment is appropriate if "materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," Fed. R. Civ. P. 56(c), show that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex*, 477 U.S. at 322. The party moving for summary judgment bears the burden of demonstrating that no genuine dispute exists as to material facts. *Pulliam Inv. Co. v. Cameo Props.*, 810 F.2d 1282, 1286 (4th Cir. 1987). If the moving party demonstrates that there is no evidence to support the non-moving party's case, the burden shifts to the non-moving party to identify specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 322–23. A material fact is one that "might affect the outcome of the suit

---

[9] In his Declaration, Rucker states that on August 18, 2015, Harrison told him "that Warden Carroll Parrish wanted me off of segregation," a recommendation that Harrison adopted on September 2, 2015. ECF No. 17-6 at ¶¶ 11-12. Rucker nonetheless was transferred to WCI one week later, on September 9, 2015. *Id.* at ¶ 14. The Court accepts the veracity of Rucker's Declaration statements for the purpose of summary judgment review.

under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001)

(quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is

only genuine if sufficient evidence favoring the non-moving party exists for the trier of fact to

return a verdict for that party. *Anderson*, 477 U.S. at 248. However, the nonmoving party

"cannot create a genuine issue of material fact through mere speculation or the building of one

inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1986). The Court may only

rely on facts supported in the record, not simply assertions in the pleadings, in order to fulfill its

"affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from

proceeding to trial." *Felty v. Grave-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987)

(quoting *Celotex*, 477 U.S. at 324–25). When ruling on a motion for summary judgment, "[t]he

evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his

favor." *Anderson*, 477 U.S. at 255. Because Rucker is self-represented, his submissions are

liberally construed. *See Erickson v. Pardus*, 551 U.S. 89, 94 (2007).

## III.   DISCUSSION

### 1.   Sovereign Immunity

Rucker sues Harrison in his official and individual capacities. Judgment against a public

employee "in his official capacity" imposes liability on the public entity. *See Brandon v. Holt.*

469 U.S. 464, 471-72 (1985) (citing *Monell v. New York Dept. of Soc. Serv.*,436 U.S. 658, 690 n.

55 (1978). It follows that Rucker's suit against Harrison for actions undertaken in his official

capacity is an action against the State of Maryland. Under the Eleventh Amendment to the

United States Constitution, a state, its agencies and departments are immune from suits in federal

court brought by its citizens or the citizens of another state, unless it consents. *See Penhurst State*

*Sch. and Hosp. v. Halderman*, 465 U.S. 89, 100 (1984). While the State of Maryland has waived

its sovereign immunity for certain types of cases brought in state courts, *see* Md. Code Ann.,

State Gov't § 12-201(a), it has not waived its immunity under the Eleventh Amendment to suit in federal court. Thus, Rucker's complaint against Harrison in his official capacity is barred by the Eleventh Amendment.

### 2.    Retaliation

Rucker's remaining claim against Harrison fares no better. In order to prevail on a claim of retaliation for acts undertaken by Harrison in his individual capacity, Rucker must allege either that the retaliatory act was taken in response to the exercise of a constitutionally protected right or that the act itself violated such a right. *Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994). Allegations of retaliation set forth in wholly conclusory terms cannot proceed, and "may safely be dismissed on the pleadings alone." *Gill v. Mooney*, 824 F.2d 192, 194 (2nd Cir. 1987) (quoting *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2nd Cir. 1983)). In the prison context, courts treat retaliation claims "with skepticism because '[e]very act of discipline by prison officials is by definition 'retaliatory' in the sense that it responds directly to prisoner misconduct.'" *Cochran v. Morris*, 73 F.3d 1310, 1317 (4th Cir. 1996) (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).This district has further distilled its definition of impermissible retaliation:

> Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights. *Perry v. Sindermann*, 408 U.S. 593, 597 (1972). Where there is no impairment of the plaintiff's rights, there is no need for the protection provided by a cause of action for retaliation. Thus, a showing of adversity is essential to any retaliation claim.

*ACLU of Maryland, Inc. v. Wicomico County*, Md. 999 F.2d 780, 785 (4th Cir. 1993).

Here, Rucker alleges that he was retaliated against for exercising his First Amendment right to free speech and to seek redress of grievances, which "to a limited extent, exist in a prison setting." *Gullet v. Wilt*, 869 F.2d 593 (4th Cir. 1989). "The Fourth Circuit has not addressed in a published opinion whether inmates have a First Amendment right to be free from retaliation for

11

filing grievances relating to misconduct by prison officials." *Hendrick v. Bishop*, No. CV TDC-14-2544, 2016 WL 1060212, at \*6 (D. Md. Mar. 15, 2016). In *Hendrick*, Judge Chuang relied upon unpublished Fourth Circuit decisions to hold that the filing of a grievance alleging excessive force by correctional officers is protected by the First Amendment. *Id.* at \*7. However, he went on to conclude that such claims were barred by qualified immunity since the Defendants had not violated a clearly established constitutional right. *Id.* at \* 11. Here, as in *Hendrick*, Harrison asserts the defense of qualified immunity. Thus, without opining on whether or not the filing of said grievance is protected by the First Amendment, the Court finds that Rucker's claims of First Amendment retaliation are barred because the right is not clearly established.

Rucker's remaining claim for retaliation rests on whether or not the acts themselves violated a constitutional right. There is no doubt that Rucker's life within the Division of Correction changed dramatically after the USB charger and hidden compartment were discovered in his cell. He was charged with violating prison rules and placed on disciplinary segregation, thus losing his ability to work and pursue formal education. After completing his disciplinary sentence, he remained apart from general population and was assigned to administrative segregation pending transfer to a higher security institution. Thus, each of these restrictions shall be examined in light of circuit precedent concerning retaliation, to determine whether the restrictions themselves violated a constitutional right.

### i.   **Disciplinary Segregation**

Rucker does not dispute that he was found to possess a USB cord. He implies that the cord was used to power other appliances, and was not intended for use with a cell phone. He also implies that Harrison's further investigation into whether Rucker was involved in passing cell phones within the prison, made possible because of freedoms afforded a prisoner attending

classes and working in a prison shop, was undertaken solely to force Rucker's transfer and cost
him those freedoms.

The smuggling and use of cell phones within detention centers and correctional
institutions is a known security risk; an officer assigned to a prison Intelligence Division would
be remiss if she or he failed to initiate further investigation after a USB cord was discovered in a
cell. Rucker correctly indicates a USB cord can be used to power various electronic devices;
however, it cannot be denied that such a cord also can charge a cell phone. "Discipline by prison
officials in response to a wide range of misconduct falls within the expected perimeters of the
sentence imposed by a court of law." *Sandin v. Conner*, 515 U.S. 472, 485 (1995).
Without allegations of "atypical, significant deprivation," disciplinary segregation in and of itself
does not rise to a violation of a constitutional right. *Id.* (holding that punishment of thirty days in
disciplinary segregation does not amount to a violation of constitutional rights). Thus, Rucker's
claims regarding disciplinary segregation do not meet muster under the case law cited above, as
it fails to allege that the act of disciplinary segregation itself violated a constitutional right. *See*
*Adams v. Rice*, 40 F.3d 72, 75 (4th Cir. 1994).

### ii.    Lost Opportunities

Rucker's loss of his prison job and opportunity for education does not implicate a
constitutionally protected liberty interest. Such interest is created by the imposition of an
"atypical and significant hardship on the inmate in relation to the ordinary incidents of prison
life." *Sandin*, 515 U.S. at 484. "[G]iven a valid conviction, the criminal defendant has been
constitutionally deprived of his liberty to the extent that the State may confine him and subject
him to the rules of its prison system so long as the conditions of confinement do not otherwise
violate the Constitution." *Meachum v. Fano*, 427 U.S. 215, 224 (1976). Dismissal from a prison

13

job and educational opportunity that Rucker did not have a constitutional right to receive is not a hardship. *See Bulger v. United States Bureau of Prisons*, 65 F.3d 48, 50 (5th Cir. 1995) (termination from job resulting in loss of ability to accrue good-time credit automatically is not an atypical and significant hardship.).

### iii.    Assignment to Administrative Segregation

Rucker infers that he was not a threat to institutional security, and should not have been placed on administrative segregation after completion of his disciplinary segregation sentence. While Rucker deems his possession of a USB cord to be harmless, corrections officials did not; his continued restriction on segregation status, as well as any prison documents indicating Rucker may have introduced contraband into the facility through his participation in the Goucher program, are the outcome of his misconduct, and cannot be attributed to retaliation.

Any liberty interest implied by Rucker's continued confinement to segregation is tenuous at best. The touchstone for determining whether or not a particular housing assignment within the prison invokes a liberty interest has been explained by the Supreme Court. "[T]hese interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483-84 (internal citations omitted). In *Beverati v. Smith*, 120 F.3d 500, 504 (4th Cir. 1997) this standard was applied to allegations that inmates were confined to administrative segregation for six months in "cells [that] were infested with vermin; were smeared with human feces and urine; and were flooded with water from a leak in the toilet on the floor above." The court held that those conditions did not implicate a liberty interest in avoiding administrative segregation because they did not represent a significant

14

hardship. *Id*. Rucker does not claim he was subjected to equivalent conditions, and his administrative segregation status was reviewed monthly pending his transfer to WCI several months later.

What is more troubling is the dispute between the parties as to whether and when Rucker actually received notice of his administrative segregation assignment. For the purpose of summary judgment, the Court accepts as true Rucker's assertion that Harrison never delivered the notice to Rucker as claimed.[10] The parties do not dispute that Rucker met with the case management team to discuss his administrative segregation placement four days later, on April 30, 2015, and received the team's recommendation of assignment to administrative segregation on May 4, 2015.[11] ECF No. 14-3 at 27.

The mere fact that a DOC rule or regulation was violated does not necessarily mean that a due process violation occurred. *See Riccio v. County of Fairfax*, 907 F.2d 1459, 1466 (4th Cir. 1990) ("a state does not necessarily violate the Constitution every time it violates one of its rules."); *Ewell v. Murray*, 813 F. Supp. 1180, 1183 (W.D. Va. 1995) ("Even if state law creates a liberty interest, violations of due process are to be measured against a federal standard of what process is due."). Indeed, a number of courts have examined this issue in the context of prison disciplinary proceedings, and concluded that "there is no denial of due process if the error the inmate complains of is corrected in the administrative appeal process." *Morissette v. Peters*, 45

---

[10] As previously outlined, Rucker submitted an ARP complaint that Harrison had falsified the Notice of Assignment to Administrative Segregation because he did not work on Sundays, and could not have delivered the notice on April 26, 2015. The Commissioner of Correction found that the Notice was presented but Rucker refused to accept it. The Commissioner further found that Harrison did not comply with a regulation that a second staff member sign the Notice stating Rucker refused to accept it. ECF No. 14-3 at 36-37. In ARP MCIJ 0379-15, Rucker complained that Harrison submitted a false report with the intention to mislead with regard to serving the notice. ECF No. 14-3 at 41-42. This claim was dismissed as being a case management issue. *Id.* at 41. The ARP decisions are not germane to the question of due process, and are not considered in adjudicating Rucker's notice claim.

[11] Additionally, he was provided copies of the notice on June 24 and June 25. ECF No. 14-3 at 31, 38. In addition, on August 2, 2015 Rucker states that he received a copy of the notice. ECF No. 14-3 at 41.

F.3d 1119, 1122 (7th Cir. 1995) (citing *Harper v. Lee*, 938 F.2d 104, 105 (8th Cir. 1991)); *Young v. Hoffman*, 970 F. 2d 1154, 1156 (2nd Cir. 1992) ("administrative reversal constituted part of the due process protection [inmate] received, and it cured any procedural defect that may have occurred"). In *Morissette*, the stakes were higher than they are here since that case dealt with disciplinary proceedings, which may result in a loss of good conduct time. Here, the Court extends the logic present in *Morissette* to conclude that there was no denial of due process when any omission regarding notice of assignment to administrative segregation of a prisoner about to be released from disciplinary segregation was quickly rectified.

In short, the adoption of procedural guidelines does not give rise to a liberty interest. *See Culbert v. Young*, 834 F.2d 624, 628 (7th Cir. 1987). Therefore, the failure to follow regulations does not, in and of itself, result in a violation of due process. Further, regardless of any alleged violations of internal regulations, the law is settled that the failure to follow a prison directive or regulation does not give rise to a federal claim, if the constitutional minimum is met. *See Myers v. Kelvenhagen*, 97 F.3d 91, 94 (5th Cir. 1996); *see also Rivera v. Wohlrab*, 232 F. Supp. 2d 117, 123 (S.D.N.Y. 2002). Such was the case here, where notice was provided, at latest, during a face-to-face meeting with case managers four days later.

### iv.    Transfer

A classification decision or a transfer from one prison facility to another typically does not implicate a protected liberty interest or state a claim under § 1983. *See, e.g., Meachum v. Fano*, 427 U.S. 215, 224 (1976); *Paoli v. Lally*, 812 F.2d 1489, 1492-93 (4th Cir. 1987). Indeed, prisoners have no liberty interest in being housed in any particular facility, *see Olim v. Wakinekona*, 461 U.S. 238, 244-45 (1983), and are not entitled as a matter of constitutional law to be housed at any particular security classification or prison. *See Slezack v. Evatt*, 21 F. 3d 590, 595 (4th Cir. 1994).

16

Rucker's argument that his transfer is retaliatory potentially states an actionable claim, but is not borne out by the record. He was found in possession of contraband that suggests he had access to a cell phone. He was provided an opportunity to remain at MCIJ by giving up the privileges that allowed him more access to the institution, refused, and was subsequently transferred to WCI.

The Court is mindful that functions of prison management, such as security or prisoner placement, must be left to the broad discretion of prison administrators to enable safe and effective management. *See, e.g., Gaston v. Taylor*, 946 F.2d 340, 343 (4th Cir. 1991); *Wetzel v. Edwards*, 635 F.2d 283, 288 (4th Cir. 1980). That discretion will not be disturbed under the facts of this case.

## IV.    CONCLUSION

For the foregoing reasons, Defendant Harrison's Motion to Dismiss or, in the Alternative, for Summary Judgment is granted and this action is dismissed. A separate Order follows.


Dated: October 31, 2016

GEORGE J. HAZEL
United States District Judge